68 P.3d 434

**STATE of Arizona, Appellee,**

v.

**John R. SANDERS, Appellant.**

No. 1CA–CR 00–0326.

Court of Appeals of Arizona, Division 1, Department D.

May 13, 2003.

As Amended May 22, 2003.

---

* The Honorable Warren J. Granville, a judge of the Maricopa County Superior Court, was authorized to participate as a judge *pro tempore* of the Arizona Court of Appeals by order of the Chief Justice of the Arizona Supreme Court. Ariz. Const. art. 6 § 31; A.R.S. § 12–145 *et seq.* (1992 & Supp.2002).

Terry Goddard, Attorney General by Randall M. Howe, Chief Counsel, Criminal Appeals Section and Kerri L. Cox, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender by Spencer D. Heffel, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

SULT, Judge.

¶ 1 In this opinion we address the interplay between the notice requirement of the Sixth Amendment to the United States Constitution and that portion of Rule 13.5(b) of the Arizona Rules of Criminal Procedure governing amendments to an indictment or information. We hold that an amendment proposed mid-trial that changes the nature of the original charge deprives an accused of the type of notice and opportunity to prepare a defense contemplated by the Sixth Amendment and is therefore not permitted by Rule 13.5(b). Because defendant John R. Sanders was convicted of aggravated assault in violation of this principle, we reverse the judgment of conviction for that offense.

## BACKGROUND

¶ 2 On November 14, 1999, about 12:45 a.m., Officer Vincent Bingaman of the Phoenix Police Department observed defendant run a red light at 43rd Avenue and Interstate 10. The officer followed defendant's vehicle to the trailer park where defendant and his wife resided. As defendant pulled into the parking lot, Bingaman shone a bright spotlight into defendant's car, then followed the car into the parking lot. Defendant stopped abruptly, got out of his car, and walked quickly toward Bingaman's patrol vehicle, waving his arms and shouting such comments as, "Is there a problem?" and "What did I do?"

¶ 3 Bingaman got out of his vehicle and asked defendant several times for his driver's license. Defendant refused to produce his license and persisted in demanding to know what he had done wrong. Because defendant would not cooperate, Bingaman informed him that he was under arrest and thereupon attempted to grab defendant's arm. Defendant spun quickly toward the officer, breaking his grip by hitting the officer's forearm with his own arm. A physical struggle ensued, with Bingaman attempting to arrest defendant and defendant resisting. Bingaman summoned his canine partner, "King," who jumped out of the police car and subdued defendant by mauling his leg. Backup officers arrived and defendant was successfully taken into custody.

¶ 4 At the preliminary hearing, Bingaman was the only witness. In connection with the assault charge, he testified on both direct and cross-examination to defendant's striking his arm and thereby dislodging his grip on defendant. The prosecutor asked no questions regarding whether the officer perceived any further threat from defendant, and when defense counsel attempted to inquire whether defendant threatened to hit the officer or used any verbal threats toward the officer, the prosecutor objected on hearsay grounds. The objection was sustained and thus no evidence was elicited regarding whether the officer apprehended any imminent physical injury from defendant.[1]

---

1. The magistrate's ruling was incorrect because the question was not asked to establish the truth of an assertion but to establish an utterance. The fact of an utterance is a non-hearsay occurrence, not a hearsay statement. *See* Rule 801(a) & (c), Arizona Rules of Evidence; John W. Strong, et al., *McCormick on Evidence* § 249 (4th Ed.1992).

¶ 5 Following the preliminary hearing, defendant was charged by information with resisting arrest and aggravated assault. The latter offense was specifically charged as follows:

> JOHN R. SANDERS, on or about the 14th day of November, 1999, knowing, or having reason to know, that Vincent Bingaman was a peace officer, or a person summoned and directed by a peace officer engaged in the execution of any official duties, knowingly touched Vincent Bingaman, with the intent to injure, insult or provoke him, in violation of A.R.S. §§ 13–1203(A)(3), 13–1204(A)(5)(B), 13–701, 13–702 and 13–801.

¶ 6 The matter proceeded to a jury trial, and the aggravated assault charge that was read to the jury at the beginning of the case alleged that the assault was committed by a knowing touching with the intent to injure, insult, or provoke. The prosecutor, in her opening statement, described how defendant turned and hit the officer on the arm. She also alluded to the officer's uncertainty regarding his safety because it was late at night and he was the only officer on the scene, but this comment was made in connection with the prosecutor's explanation as to why the officer loosed his canine partner on defendant.

¶ 7 During her examination of the officer, the prosecutor did not ask him whether he feared defendant might physically harm him or why the officer would think that was a possibility. Neither did the prosecutor elicit any testimony to demonstrate that such a fear would have been reasonable. The officer did volunteer that he had employed the dog for assistance because defendant had hit him once and might hit him again.

¶ 8 Defense counsel's opening statement was specific in describing the alleged assault as occurring when defendant "knocked the officer's arm off Mr. Sanders' arm." And during the officer's testimony at trial, defense counsel confirmed with the officer exactly what circumstance the officer considered to have constituted the charged assault:

> Q. You testified on direct that the only time Mr. Sanders touched you before the dog attacked him was when his forearm knocked your forearm. Is that the assault?
>
> A. When he struck my arm breaking the grip that I had on his left arm, that's the assault.

Defense counsel conducted no cross-examination into whether the officer apprehended imminent physical injury from defendant, what the source of such apprehension might be, or whether it was reasonable under the circumstances.

¶ 9 At the conclusion of its case-in-chief, the state moved pursuant to Rule 13.5(b) to amend the assault charge to allege a violation of Arizona Revised Statutes ("A.R.S.") § 13–1203(A)(2) (2001), proscribing an assault committed by intentionally placing another in reasonable apprehension of imminent physical injury. This charge supplanted the original allegation of an assault pursuant to A.R.S. § 13–1203(A)(3) committed by a knowing touching with intent to injure, insult, or provoke. The prosecutor did not explain why she wanted to abandon the original allegation but simply asserted that the amendment was necessary to conform to the evidence that had been presented.

¶ 10 Defendant's objection to the proposed amendment was overruled, and the trial court ordered a change in the assault charge from a "knowing touching" allegation to a "reasonable apprehension" allegation. The information thereupon read:

> JOHN R. SANDERS, on or about the 14th day of November, 1999, knowing, or having reason to know, that Vincent Bingaman was a peace officer, or a person summoned and directed by a peace officer engaged in the execution of any official duties, intentionally placed Vincent Bingaman in reasonable apprehension of imminent physical injury, in violation of A.R.S. §§ 13–1203(A)(2), 13–1204(A)(5)(B), 13–701, 13–702 and 13–801.

¶ 11 The defense then put on its case with defendant and his wife testifying. Defendant admitted "grabbing" the officer but asserted that it was only to maintain his balance. He insisted that he never threatened in any way to hit the officer. The bulk of his testimony related to his fear of the dog as his reason

and justification for resisting being hand-cuffed.

¶ 12 At an ensuing conference to settle jury instructions, the trial court permitted defense counsel to renew her objection to the amendment and state her reasons. She began by asserting that because of the amendment, she was unprepared to argue jury instructions. She stated, "approximately an hour ago we had an offense of a touching of the officer. Now we don't have that and we have a reasonable apprehension of the officer.... The change in this complaint is changing my whole theory of the defense. My defense was self-defense. How can I have a self-defense argument to an officer's reasonable apprehension of physical injury?" She expressed her fear of rendering ineffective assistance to her client and concluded: "I'm having a difficult time coming up with what my closing is going to be, let alone jury instructions, because now we have changed the charge."

¶ 13 The prosecutor responded that the officer had testified that he was in fear, and that the amendment was not that much of a surprise because "it's something that has been a part of the facts from the beginning." She added: "It's not a completely separate charge, basically changing one of the elements."

¶ 14 The trial court again overruled defense counsel's objections, explaining:

And I'm just not persuaded that an objective view of the evidence in this case by an attorney would leave the attorney with the impression that an officer in this situation who's testified that he was holding onto this guy's arms and couldn't control him because of the weight disparity—and there is obviously a very big weight disparity, your client clearly outweighs the officer and is a much bigger man—that this officer wasn't in a reasonable apprehension. If this guy chose, he could beat the hell out of him. And that is a question of fact for the jury.

So, I think under the totality of the circumstances, at night, in this lot, with all the things the officer was testifying about, that I would be a little reluctant to accept as an objective matter that an attorney

wasn't on notice that this could be one of the bases of the State's argument.

¶ 15 Although defense counsel had expressed her disappointment at being deprived of a self-defense theory, she nevertheless requested self-defense instructions. The trial court refused, however, and counsel then argued the case to the jury. Regarding the assault charge, defense counsel focused on the officer's fear of injury, asserting that it was unreasonable. The jury was not persuaded and convicted defendant of the assault charge as well as the resisting arrest charge. The trial court sentenced defendant to a term of probation with appropriate conditions, designating the assault a class 1 misdemeanor but leaving the resisting charge as a class 6 felony with the option to designate it a misdemeanor upon successful completion of probation. Defendant timely appealed the assault conviction.

### ISSUE

Did the trial court violate the Sixth Amendment's notice requirement when it permitted the state to amend the assault charge after the close of the state's case-in-chief?

### ANALYSIS

¶ 16 The charging of a criminal offense is regulated by the requirement found in the Sixth Amendment that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation." With respect to charging an offense, this requirement, generally referred to as the "notice" component of the Amendment, means that the indictment or information must describe the offense with sufficient specificity so as to enable the accused to prepare a defense and to permit him to avail himself of the protection against double jeopardy. *United States v. Cruikshank*, 92 U.S. 542, 558, 23 L.Ed. 588 (1875). *See also* Rule 13.2(a), Arizona Rules of Criminal Procedure ("The indictment or information shall be a plain, concise statement of the facts sufficiently definite to inform the defendant of the offense charged."). Specificity also serves to inform the trial court of the facts alleged so that the court may judge

whether those facts, if proven, would be sufficient to support a conviction for the offense charged. *Cruikshank*, 92 U.S. at 558.

¶ 17 In this case, we are concerned not with the process of bringing an original charge but with amending such a charge. The amendment process is governed by the same Sixth Amendment principles applicable to an original charge, *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644 (1948), and while the Amendment does not bar any change at all to an original charge, a proposal to amend will be rejected if its substance or timing is such as to undermine or defeat the interest in a fair trial that the Amendment is designed to protect, *Sheppard v. Rees*, 909 F.2d 1234 (9th Cir.1990). A fair trial, as the United States Supreme Court has observed, is "one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues *defined in advance of the proceeding.*" *Strickland v. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (emphasis added).

¶ 18 Arizona's amendment mechanism is found in Rule 13.5(b), Arizona Rules of Criminal Procedure. The rule provides:

**Altering the Charges; Amendment to Conform to the Evidence.** The preliminary hearing or grand jury indictment limits the trial to the specific charge or charges stated in the magistrate's order or grand jury indictment. The charge may be amended only to correct mistakes of fact or remedy formal or technical defects, unless the defendant consents to the amendment. The charging document shall be deemed amended to conform to the evidence adduced at any court proceeding.

¶ 19 In construing this rule, our supreme court has stated that the test to determine what amendments are constitutionally permitted is whether the amendment changes the nature of the offense charged or prejudices the defendant in any way. *State v. Bruce*, 125 Ariz. 421, 423, 610 P.2d 55, 57 (1980). If the answer to both is in the negative, then the amendment passes Sixth Amendment scrutiny and qualifies as a merely formal or technical amendment. *Id.* Examples of permissible amendments include changing one digit in the serial number of a television set in a prosecution for receiving stolen property, *State v. Butler*, 9 Ariz.App. 162, 165, 450 P.2d 128, 131 (1969); changing a corporate name from National Hospitalization, Inc. to National Hospital Plan Insurance Agency in a securities fraud proceeding, *State v. Barber*, 133 Ariz. 572, 577, 653 P.2d 29, 34 (App.1982); or changing the date of the offense by one day when defendant knew long before trial of the correct date, *Bruce*, 125 Ariz. at 423, 610 P.2d at 57. The common theme in these cases is that the defect is minor and correcting it does no harm to the defendant's ability to defend himself.

¶ 20 An amendment that changes the nature of the offense, however, cannot be classified as a mere formal or technical amendment. We first note that when such an amendment is proposed, prejudice is not a necessary inquiry. The test for a Sixth Amendment violation is stated in the disjunctive; either the amendment changes the nature of the offense *or* prejudices the defendant. *Bruce*, 125 Ariz. at 423, 610 P.2d at 57. If it is the former, the rule clearly implies that prejudice inheres in the amendment and is conclusively presumed. As the Tenth Circuit Court of Appeals held in *Hunter v. New Mexico*, 916 F.2d 595, 599 (10th Cir.1990), when the Sixth Amendment is violated by an amendment that "actually modifies an essential element of the offense charged . . . it is reversible per se."

¶ 21 This presumption of prejudice is rooted in the principle that "some constitutional errors require reversal without regard to the evidence in the particular case." *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). An error that implicates a constitutional right that is "basic to a fair trial . . . can never be treated as harmless." *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). A Sixth Amendment violation arising from an amendment to the nature of the charge during trial is included in this category because "[a] trial cannot be fair unless the nature of the charges against a defendant are adequately made known to him or her in a timely fashion." *Sheppard*, 909 F.2d at 1237.

¶ 22 There is a practical underpinning to the reversible per se rule. The existence of prejudice in a given case generally must be determined from a review of the proceedings in which the conviction was obtained. However, when a trial commences with one charge and that charge is thereafter amended to change the nature of the offense, the record of that trial is useless as a tool to determine whether a defendant was prejudiced by the amendment.

¶ 23 To illustrate, if a defendant's counsel is notified that his client faces a certain charge, he prepares for trial on that charge with the result that his opening statement, his cross-examination of the state's witnesses, his presentation of his client's case, and all other efforts are targeted at the elements contained in the charged offense. He justifiably neglects to prepare for or pursue inquiry into matters that are irrelevant to those elements, even though evidence of such matters might arise during trial and even though the evidence might constitute another crime.

¶ 24 When the state is nevertheless permitted to amend in order to charge this other crime, the resulting conviction cannot be justified on the basis that there is evidence in the record to support the amended charge, and that defendant was therefore not prejudiced by the amendment. Such an approach overlooks the fact that the trial record is irrevocably tainted because we can never know from that record whether the evidence of the amended charge could have withstood a well-prepared cross-examination, a different justification defense, or any other of the many testing devices inherent in our adversarial process. "The constitutional requirement of a fair trial is not satisfied merely by the existence in the record of sufficient evidence to establish guilt. To apply such a test as dispositive would be to ignore other mandatory components of a fair trial, and would defeat the purpose of the notice requirement." *Sheppard*, 909 F.2d at 1238.

¶ 25 The next question is how to recognize when a proposed amendment would change the nature of an offense. An amendment can do so either by proposing a change in factual allegations or a change in the legal description of the elements of the offense.[2] An example of the former is *State v. Singh*, 4 Ariz.App. 273, 419 P.2d 403 (1966). There, the defendant was charged with passing a forged instrument to one person, but at the close of its case-in-chief the state was permitted to amend the charge to allege the passing of the instrument to another person. *Id.* at 277–78, 419 P.2d at 407–08. This court held the amendment impermissible, explaining "while the rule will allow an amendment to be made to the information … it does not allow an amended information to be substituted to charge defendant with a different crime." *Id.* at 277, 419 P.2d at 407.

¶ 26 A case illustrating the substitution of an offense with differing elements for the offense actually charged is *Gray v. Raines*, 662 F.2d 569 (9th Cir.1981), a habeas corpus proceeding originating in Arizona state court. There, the state charged defendant with first-degree (forcible) rape where the age of the victim is irrelevant and consent is a defense. At a conference near the end of the presentation of evidence after the defendant had admitted intercourse and testified regarding the victim's consent thereto, the prosecutor sought and obtained an instruction on second-degree (statutory) rape where the victim's age is relevant and consent is unavailable as a defense. The 9th Circuit granted the writ and vacated the statutory rape conviction, noting that although both types of rape were included in the Arizona statute proscribing rape, each had different elements. The court reasoned that "[b]ecause first and second degree rape are distinct offenses, and second degree rape is not an included offense, the state was obligated to comply with the Sixth Amendment notice

---

**2.** An amendment to the charge does not violate the Sixth Amendment when it changes the legal description by charging a crime that is a lesser-included offense of the original charge. Rule 13.2(c), Arizona Rules of Criminal Procedure; *see State v. Kelly*, 123 Ariz. 24, 26, 597 P.2d 177, 179 (1979) (amending charge of armed robbery to robbery, while a change in the nature of the offense and therefore technically error, was not reversible because robbery is a lesser-included offense).

requirement when bringing a second degree rape charge." *Id.* at 572.

¶ 27 A similar case is *Government of the Virgin Islands v. Joseph*, 765 F.2d 394 (3d Cir.1985). There the defendant was charged with first-degree (forcible) rape, a crime under the Virgin Islands criminal code where the age of the victim is irrelevant. *Id.* at 395–96. After the close of the evidence, the government sought and obtained instructions on both first-degree rape and third-degree rape, the latter criminalizing sexual contact because the victim is under sixteen but over fourteen. *Id.* at 396. Defendant's counsel did not object, and the jury ultimately convicted defendant of third-degree rape. *Id.*

¶ 28 On appeal, the Third Circuit Court of Appeals determined that third-degree rape was not a lesser-included offense of first-degree rape; rather, because the former had an element that the latter did not, namely the age of the victim, they were in fact different offenses. *Id.* Consequently, the court found a variance between the original information and the jury's verdict that violated the fundamental right to notice contained in the Sixth Amendment and required that the conviction be set aside. *Id.* at 396–97.

¶ 29 The court reasoned that the information charging first-degree rape did not put the defendant on notice that he would have to prepare a defense to the claim that the victim was between the ages of fourteen and sixteen when she allegedly consented to intercourse. *Id.* at 397. The court also noted that because age was not identified as an issue prior to the jury charge, the only evidence elicited regarding the victim's age was her seemingly unimportant (at the time) testimony that she was fifteen when the rape occurred. *Id.* Had defendant been aware prior to trial that this would be an important fact, he could have disputed such testimony and prepared an appropriate defense. *Id.* at 397–98.

¶ 30 The government asserted that the defendant had waived the right to complain about the amendment to the information because he did not object at trial. *Id.* at 398. The court responded that the error in the case was so egregious, affecting the substantial right of the defendant to notice and the opportunity to defend, that it constituted "plain error" under the federal doctrine preserving such errors for appellate review notwithstanding a failure to object. *Id.* The court vacated the verdict and directed the entry of a judgment of acquittal. *Id.*

¶ 31 We turn now to the instant case. Defendant was originally charged with assault committed by a knowing touching with the intent to injure, insult, or provoke. The elements of this offense include a showing that defendant knew he touched the officer and that his intention in doing so was to injure, insult, or provoke. Assault committed in this fashion does not require any proof of the officer's state of mind during the incident.

¶ 32 The amended charge specified that defendant intentionally placed the officer in reasonable apprehension of imminent physical injury. Assault committed in this fashion requires a showing of an intent on the part of the defendant to create fear of injury in the officer, and merely showing an intent to provoke or insult would not suffice. Moreover, the state must prove the officer reasonably apprehended imminent injury, an element irrelevant to a "knowing touching" assault.

¶ 33 Further extended analysis is not necessary to demonstrate that these two types of assault are in fact distinctly different crimes. "Knowing touching" is what was traditionally known at common law as "battery," while "reasonable apprehension" was the traditional crime of assault. *See* Wayne R. Lafave & Austin W. Scott, Jr., *Substantive Criminal Law* § 7.14 (1986). In fact, these offenses were so designated by Arizona in separate statutory sections prior to the criminal code revision in 1978 when they were combined in our present assault statute. *See* former A.R.S. §§ 13–241 to 13–247 (Supp.1977); *see also* Rudolph J. Gerber, Criminal Law of Arizona, vol. 1 ch. 12 (1993). And not only are these offenses distinct, neither is a lesser-included offense of the other because each offense has elements that the other does not. *See In re Victoria K.*, 198 Ariz. 527, 530–31, ¶¶ 15–19, 11 P.3d 1066, 1069–70 (App.2000); *see also Shephard v. Florida*, 455 So.2d 479, 480 (Fla.Dist.Ct.App.

1984) (on statutory definitions quite similar to Arizona's, holding that "[a]ssault is not a necessarily included offense of battery"). We conclude, then, that the amendment in this case changed the nature of the originally charged offense.

¶ 34 The state nevertheless argues that the amendment was permissible because it was authorized by the last sentence of Rule 13.5(b) providing that "[t]he charging document shall be deemed amended to conform to the evidence adduced at any court proceeding." According to the state, the officer testified to his fear that defendant would injure him, and there was adequate circumstantial evidence from which the jury could infer that defendant intended to create this fear in the officer. Thus, the state reasons, granting the amendment did nothing more than reflect the evidence the state had presented, the precise result contemplated by the rule.

¶ 35 We strongly disagree with the reading the state gives to this provision of Rule 13.5(b). We acknowledge that the purpose of the subject sentence is not readily apparent and that if taken literally and in isolation from the rest of the rule, the sentence might be susceptible to the state's interpretation. The comment to the rule, however, after repeating the rule's language, adds some illumination by noting that for amendments pursuant to this sentence, "no motion or formal action is required." We conclude with the help of this explication that the framers intended the last sentence to cover those situations in which there has been some minor factual or technical variance between the charge and the proof and the defendant later attacks his conviction based on this variance. In those situations, such as on a motion for new trial or on appeal to a higher court, the charging document upon which the case was tried will be deemed amended to conform to the judgment of conviction that incorporates and rests on the variance. *See State v. Roscoe,* 145 Ariz. 212, 225, 700 P.2d 1312, 1325 (1985). That no motion had been made to formalize the amendment will be considered irrelevant.

¶ 36 This interpretation is clearly preferable to that of the state. By taking the position that if evidence of another offense is admitted during trial the state may amend to charge that offense, the state in effect is construing this last sentence as an exemption from its obligation to adhere to the Sixth Amendment's notice requirement. Following the state's reasoning, a defendant could be tried for one offense and in that proceeding evidence of other crimes could be admitted under Rule 404(b), Arizona Rules of Evidence. The prosecution could then obtain an amendment charging defendant with these other crimes and the jury could in that same proceeding convict on the amended charges.

¶ 37 We do not believe the members of the Arizona Supreme Court, the framers of Rule 13.5(b), had such an implausible result in mind when they added the last sentence to the rule. A defendant does not suffer a constitutionally diminished entitlement to notice from the state simply because a trial is being conducted on one charge and evidence of another offense has been admitted. Adopting the state's interpretation would mean that a defendant could never be sure of the offense or offenses for which he faced conviction until the jury received its final instructions. This interpretation would eviscerate the type of "notice" contemplated by the Sixth Amendment, namely notice given sufficiently in advance so as to provide a defendant "with an ample opportunity to prepare to defend." *Barber,* 133 Ariz. at 577, 653 P.2d at 34; *see In re Gault,* 387 U.S. 1, 33, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) ("Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded.").

¶ 38 We interpret rules of court in the same fashion that we construe statutes. *State v. Baca,* 187 Ariz. 61, 63, 926 P.2d 528, 530 (App.1996). Thus, when there are two possible interpretations of a statute or rule, we will adopt the interpretation that results in constitutional compliance rather than the one that renders the enactment unconstitutional. *Lake Havasu City v. Mohave County,* 138 Ariz. 552, 558, 675 P.2d 1371, 1377 (App.1984). With this principle in mind, we reject the state's interpretation of the last sentence of Rule 13.5(b) and adopt instead the interpretation that this sentence,

like the rest of the rule, is intended to apply only to minor factual or technical variances between the original charge and the proof that resulted in the conviction.

¶ 39 The state next defends its position by asserting that the crime of assault as defined by statute is a "unitary" offense. That is, the state contends there is only one crime of assault and that a charge of assault under one subsection necessarily puts a defendant on notice that he may be convicted under any of the other subsections. For this proposition, the state relies on this court's decision in *State v. Winter*, 146 Ariz. 461, 706 P.2d 1228 (App.1985).

¶ 40 In *Winter*, the defendant was charged with theft committed by knowingly controlling property of another with the intent to deprive. *Id.* at 463, 706 P.2d at 1230. However, the trial court instructed the jury that it could convict the defendant if it found that defendant knowingly controlled the property *either* with the intent to deprive *or* knowing or having reason to know that the property was stolen. *Id.* The jury convicted defendant, and on appeal defendant complained that she had received insufficient notice that she would be charged and convicted under a different subsection of the theft statute than that specified in the original indictment. *Id.* at 464, 706 P.2d at 1231.

¶ 41 The *Winter* court noted that although the language of the indictment was couched in terms that clearly tracked subsection (1) of the statute, the statutory citation in the indictment referenced only the general theft statute, not any particular subsection. *Id.* at 463, 706 P.2d at 1230. The court characterized the crime of theft as "unitary," meaning that there was only one crime of theft, even though the multiple subsections described different ways of committing it. *Id.* at 464, 706 P.2d at 1231. A charge using only a general citation to the theft statute "suffice[d] to charge a violation of its subparts," and the defendant therefore received adequate notice when charged under the language of subsection (1) that she could nevertheless be convicted under another subsection. *Id.* at 465, 706 P.2d at 1232.

¶ 42 *Winter* relied on this "unitary" concept to skirt any problems with Rule 13.5(b)

and the Sixth Amendment. The court held that because theft was only one crime, Rule 13.5(b) was not violated. *Id.* This is so because the change in question was simply from one subsection of a "unitary" charge to another subsection, and consequently there was "no change in the nature of the underlying crime." *Id.*

¶ 43 We do not find *Winter* persuasive. The *Winter* court undertook no comparative analysis to determine whether theft by taking control with intent to deprive was elementally the same crime as theft by taking control knowing actually or constructively that the property was stolen. Rather, the court simply noted that the Arizona theft statute derived from the Model Penal Code and adopted that authority's approach of condensing the multiple methods traditionally used to describe offenses depriving another of property or services into one crime of theft. *Id.* at 464, 706 P.2d at 1231. *Winter* acknowledged, but did not pause to consider, the Code's warning "that the success of the effort to consolidate the various forms of theft into a single offense is limited by the extent to which highly detailed charging is perceived to be mandated by constitutional limitations or the fair notice requirement." *Id.*

¶ 44 Whatever merit *Winter's* unitary approach might have in the context of Arizona's theft statute, it does not transfer to Arizona's assault statute. The warning issued by the creators of the Model Penal Code against grouping theft offenses if doing so would transgress constitutional notice requirements applies with equal vigor to the state's attempt to "unitize" the assault statute. Our analysis has demonstrated that two of the statute's subsections describe offenses with distinctly different elements. To hold that the state must tell a defendant in advance under which of the two he is being prosecuted, and to preclude the state from changing its mind in the middle of trial and thereby presumptively prejudicing the defendant, is a requirement of the Sixth Amendment that does not disappear by changing statutory nomenclature. "The state cannot ... use a classification scheme to circumvent the constitutional notice requirement im-

posed on the state when charging a defendant with an offense." *Gray*, 662 F.2d at 571. We reject the state's attempt to apply *Winter* to the assault statute.

## THE DISSENT

¶ 45 We now turn to the dissent, which disagrees not only with our result but also with most of our analysis. The dissent begins by recasting the elements of the crime with which defendant was charged. As we understand the dissent's analysis, the crime is denominated "aggravated assault upon a peace officer" and is made up of these elements: (1) an assault; (2) by defendant; (3) upon a person he actually or constructively knew to be a peace officer. *Infra*, ¶¶ 73, 78. The dissent classifies defendant's crime as a violation of A.R.S. § 13–1204, the statute listing those factors that aggravate a simple assault, rather than a violation of both § 13–1204 and the simple assault statute, § 13–1203. The dissent then applies the *Winter* rationale to the assault element and thereby consolidates into one element the three different descriptions that the legislature used in A.R.S. § 13–1203 to specify how assault is committed. *Infra*, ¶¶ 74, 75.

¶ 46 By engaging in this denominative exercise, the dissent apparently believes that it can eliminate any obligation on the part of the prosecution to specify how defendant committed the underlying assault. According to the dissent, because "assault" is a single "unitary" element, the prosecution in this case as a matter of law effectively charged the entire simple assault statute in the original information. *Infra*, ¶ 73. Therefore, when the prosecutor mid-trial changed from "knowing touching" to "reasonable apprehension" assault, the assault portion of the charge was not really amended.

¶ 47 Under the Sixth Amendment, characterizing simple assault as a single element is insufficient notice for charging purposes. The United States Supreme Court has pointed out that "the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circum-

stances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *United States v. Hess*, 124 U.S. 483, 487, 8 S.Ct. 571, 31 L.Ed. 516 (1888); *accord Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Such specificity is constitutionally required, *inter alia*, in order to permit a defendant to prepare a defense. *Cruikshank*, 92 U.S. at 558.

¶ 48 Thus, to pass muster under the Sixth Amendment, the prosecution, when charging either assault or a greater crime that contains assault as a component must provide more notice than simply "assault." The prosecution must also allege facts and circumstances that will alert the accused specifically to the type of assault he must prepare to defend against; *i.e.*, "the specific offence, coming under the general description, with which he is charged." *Hess*, 124 U.S. at 487, 8 S.Ct. 571. The prosecution cannot escape its constitutional duty to allege pertinent facts and circumstances, so in discharging this duty the prosecution must necessarily inform the defendant whether he is being charged with "physical injury" assault, "reasonable apprehension" assault, or "knowing touching" assault.[3] In short, the *Winter* method of charging cannot satisfy the Hess, *Hamling*, and *Cruikshank* test of a proper charge in the context of A.R.S. § 13–1203 assault.

¶ 49 The dissent also cites to some Arizona cases in addition to *Winter* that it asserts have "interpreted analogous statutes as simply enumerating alternative means of satisfying one element of a single offense." *Infra*, ¶ 76. Whether the statutes involved in these cases are truly analogous we cannot say because no extended analysis was undertaken to ascertain whether a particular statute encompassed more than one distinctly different offense. In this case, we have examined the assault statute and our analysis demonstrates that "reasonable apprehension" assault is a different offense from "knowing touching" assault. This result is the cornerstone of our decision and requires that we

---

**3.** *See* A.R.S. § 13–1203(A)(1), (2), and (3). The prosecution may allege more than one of these methods of assault alternatively in those instances where the facts justify such charging.

find that the mid-trial amendment from the one to the other changed the nature of the offense and was therefore impermissible under Rule 13.5(b).

¶ 50 The dissent next attributes to our decision a quite broad interpretation of Rule 13.5(b) by suggesting that we reach the "apparent conclusion" that anything other than a minor variance is prejudicial per se. *Infra,* ¶¶ 70, 78. This is not accurate. What we hold is that an amendment that changes the nature of the charged offense is prejudicial per se. In so holding, we do no more than extrapolate from the consistent interpretation of Rule 13.5(b), an interpretation always expressed in the disjunctive, that "[a] defect may be considered formal or technical when its amendment does not operate to change the nature of the offense charged *or* to prejudice the defendant in any way." *Bruce,* 125 Ariz. at 423, 610 P.2d at 57 (emphasis added).

¶ 51 When a proposed amendment does not change the nature of the offense, it may still effect a substantial change or, contrarily, it may qualify as merely formal or technical. To determine which, the amendment must be tested for its prejudicial effect. If it does not cause any prejudice, it is classified as formal or technical (*i.e.,* minor). If it does cause prejudice, it qualifies as substantial and, consequently, is precluded by Rule 13.5(b).

¶ 52 The point here is that if a non-offense changing amendment is precluded, it is not because its prejudicial effect is deemed inherent, or per se, but because given the particular circumstances in which it is proposed, it creates prejudice. Thus, the dissent is incorrect in asserting that we classify all amendments other than minor variances as prejudicial per se; rather, we simply say that all amendments other than those changing the nature of the offense require testing to determine their prejudicial effect. Our dispensing with a prejudice test for an offense-changing amendment breaks no new ground in Rule 13.5(b) jurisprudence.

¶ 53 The dissent's argument that the amendment permitted in this case was not prejudicial per se is premised upon its *Winter*-based conclusion that there was no change in the nature of the offense. *Infra,* ¶ 87. This premise also underlies the dissent's attempts to distinguish the federal cases upon which we rely that hold that an amendment changing the nature of the offense, a type of amendment classified as a "constructive amendment" in the federal system, is prejudicial per se. However, the *Winter* premise fails in the face of our analysis that has demonstrated that the amendment in this case did change the nature of the offense. Thus, a finding of inherent, or per se, prejudice is required.

¶ 54 Because the dissent rejects the prejudice per se result, it engages in a prejudice analysis that concludes that because defendant could not have been surprised by the amendment, he was not prejudiced. *Infra,* ¶¶ 91–96. We stand by our conclusion that the amendment was prejudicial per se. However, we respond to the dissent's "actual prejudice" analysis with our own because we believe our analysis will illustrate why a conclusive presumption of prejudice per se is appropriate for an offense-changing amendment, as opposed to requiring a prejudice analysis which simply cannot yield a reliable result.

¶ 55 The dissent's assertion that defendant could not have been actually surprised by the amendment in this case is seriously flawed in at least two respects. First, in conducting what actually is a harmless error analysis, the dissent overlooks that it is dealing with a tainted record. As we pointed out above, *supra,* ¶¶ 6–8, there was no direct examination or cross-examination regarding whether the officer apprehended imminent physical injury or whether, if so, that apprehension was reasonable. At the preliminary hearing stage, defense counsel's attempt to inquire of the officer regarding apprehension was blocked by the prosecution. At trial, the only evidence of any apprehension was volunteered by the officer.

¶ 56 Notwithstanding what is essentially a useless record for sufficiency review purposes, the dissent would find therein the stuff of a valid conviction. This is so even though, had the charge been "reasonable apprehension" from the beginning, defense counsel could justifiably have been charged with ineffective assistance of counsel had the

trial produced the record we have here. We agree with the Ninth Circuit's observation, in a case in which a "constructive amendment" was erroneously permitted, that when counsel's performance is compromised by having to contend mid-trial with a new charge, the composition of the record is affected such that a harmless error analysis is impossible. This is so because "[t]he record is too tainted to yield any such conclusions." *Sheppard*, 909 F.2d at 1237.

¶ 57 The second defect in the dissent's assertion that defendant could not have been surprised by the amendment is the conclusion to the effect that "facts equal notice." The dissent is able to find what it considers evidentiary support for a "reasonable apprehension" charge in parts of the preliminary hearing record and some departmental reports and statements by the officer at other proceedings of which defendant presumably was aware. *Infra*, ¶¶ 91, 92. From these sources, the dissent, and the trial court, essentially assert that defendant was always on notice that he could be required to defend against a charge of "reasonable apprehension." This is so even though the prosecutor had this same information but chose not to include a "reasonable apprehension" charge, either factually or by legal reference, in the formal charging document until trial was halfway over.

¶ 58 If facts equal notice, one wonders what purpose the Sixth Amendment's notice requirement serves or on whom it imposes the burden of giving notice. In many incidents involving criminal behavior, there are facts that implicate more than one criminal offense. We understand it to be the job of the prosecutor to select the offense or offenses that should be prosecuted and notify a defendant of that choice through a formal charge. According to the dissent's rationale, however, a defendant is implicitly noticed just by the incident itself that if anything is left uncharged by the prosecutor, the defendant must still be prepared to defend against the uncharged offense or offenses until the case is in the hands of the jury. Even assuming, as we do, that the dissent intends that this approach be limited to *Winter*-type offenses, we still cannot agree that simply

knowing that an incident *could* be charged under more than one section of a multi-offense statute is equivalent under the Sixth Amendment to knowing that it *is* so charged even though the prosecutor has not given specific and timely notice to that effect. To countenance such a conclusion is to reduce the constitutional requirement of adequate notice to an empty promise.

¶ 59 The dissent appends its conclusion that defendant was not surprised by noting that after the amendment was permitted, defense counsel did not seek to recall the officer for further cross-examination nor ask for a continuance. *Infra*, ¶ 94. This shifting of responsibility to defense counsel for the prejudice that resulted to her client not only misidentifies the actual source of the prejudice, it clashes with our traditional notions of trial advocacy and undermines the constitutional right to effective assistance of counsel.

¶ 60 When an attorney undertakes the defense of an accused, the first thing that attorney wants to know is the charge. This is so because everything that follows is tied to that charge. Witness interviews, investigations, legal research, consideration of plea offers, formation of trial strategy, and overall preparation are all premised on the formal charge that has been lodged against the client. And all of these efforts require time, reflection, consultation with the client, and oftentimes consultation with other experienced counsel.

¶ 61 To be sure, a trial is an evolving landscape, and part of a trial lawyer's chronic insecurity, and her compensating effort to be fully prepared, stem from the knowledge that she faces the possibility of unexpected reverses. For example, a witness' story could change, or an evidentiary ruling could be adverse. But the one constant upon which the lawyer ought to be able to rely is that once the jury is seated, the charge will not change unless her client consents. This certainly seems to be the guarantee provided by both Rule 13.5(b) and the Sixth Amendment with its interpretative jurisprudence.

¶ 62 When in the middle of trial this guarantee turns out to be an illusion, one should not be surprised that even the experienced lawyer, flummoxed at this unwarranted turn of events, will not try the rest of the case in

as effective a manner as the appellate court, with the benefit of hindsight and time for reflection, thinks she should have. Put another way, there is a sound, practical reason why an amendment changing the nature of the offense is prejudicial per se; that is because one simply cannot prepare for and try one offense until the middle of trial and, except by happy accident, effectively try another offense for the remainder. That is precisely what happened here and the dissent's criticism of defense counsel in this case is misplaced.

¶ 63 The dissent also interposes a discussion of double jeopardy implications arising from our decision to permit the state, if it desires, to refile a "reasonable apprehension" charge against defendant. *Infra*, ¶¶ 89, 90. We first assume that the dissent is not suggesting that double jeopardy precludes the prosecutor from refiling. The double jeopardy clause does not bar retrial of a defendant who has successfully appealed a conviction unless the reversal of the conviction is based upon an insufficiency of the evidence. *Tibbs v. Florida*, 457 U.S. 31, 39–40, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Here, the ground for reversal is a violation of Rule 13.5(b) and the Sixth Amendment notice requirement.

¶ 64 What the dissent suggests is that our decision would, in effect, permit the prosecution to successively try a defendant for "knowing touching" assault on a peace officer and, in the event of an acquittal, try him for "reasonable apprehension" assault on a peace officer. *Infra*, ¶ 90. The dissent then asserts that by applying the *Winter* doctrine to the assault statute, a different result would obtain because the acquittal would be for "aggravated assault on a peace officer" which would bar any further prosecution for what the dissent terms the "same offense." *Infra*, ¶ 90. We are reluctant to be drawn into a discussion in the abstract of double jeopardy issues that are not presented in this case. However, in order to address the dissent, we

note that if multiple prosecutions for "knowing touching" and "reasonable apprehension" simple assault are possible, this is not because of our decision but because of the United States Supreme Court's decision in *United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). Nor would the dissent's *Winter* approach impede or prevent multiple prosecutions pursuant to *Dixon* for either simple or aggravated assault.

¶ 65 The *Dixon* case held that a "same elements" test, as promulgated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), is the only permissible interpretation of the double jeopardy clause. That test inquires whether each of two offenses contains an element not contained in the other. If not, they are the same offense and double jeopardy bars successive prosecutions. *Dixon*, 509 U.S. at 696, 113 S.Ct. 2849.

¶ 66 *Dixon* overruled *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which had promulgated a broader test that would have extended double jeopardy protection into a "same conduct" context. *Dixon*, 509 U.S. at 711–12, 113 S.Ct. 2849. While a "same conduct" test might insulate a defendant from successive prosecutions for aggravated assault on a peace officer, a "same elements" test does not. As we have demonstrated, "knowing touching" and "reasonable apprehension" are not the same element and therefore a conviction based on one type will not bar prosecution on the other, at least under the federal double jeopardy clause.[4] *Dixon*, 509 U.S. at 696, 113 S.Ct. 2849.

¶ 67 This result would not change by trying to impose a *Winter* "renaming" veneer on the statute. Just as the *Dixon* court rejected *Grady's* attempt to broaden double jeopardy protection when *Grady* created a "same conduct" test, so would it ignore a *Winter*-inspired consolidation of analytically dispa-

---

**4.** We intimate no opinion whether the Arizona double jeopardy clause is susceptible to a more expansive interpretation than that given the federal clause. *Compare Pool v. Superior Court*, 139 Ariz. 98, 108, 677 P.2d 261, 271 (1984), declining in the circumstances presented to apply to the state clause the U.S. Supreme Court's interpretation of the corresponding federal clause, *with State v. Eagle*, 196 Ariz. 188, 190, ¶ 5, 994 P.2d 395, 397 (2000), suggesting, without analysis, that the protections offered by the two clauses are coterminous.

rate multiple offenses into a single "element." No court applying *Dixon* and conducting a "same elements" test in the double jeopardy context is going to be persuaded to broaden double jeopardy protection by honoring *Winter's* "renaming" device. The dissent's contrary assertion is unfounded and unrealistic.

## CONCLUSION

¶ 68 The trial court violated the Sixth Amendment by permitting the state to amend the charge in this case. With respect to further proceedings on remand, the state abandoned the "knowing touching" allegation after the jury was empaneled. We equate this abandonment to a voluntary dismissal by the state due to insufficient evidence and, therefore, the state is now precluded by federal double jeopardy principles from retrying defendant on that charge. *See Tibbs*, 457 U.S. at 39–40, 102 S.Ct. 2211. On the other hand, the "reasonable apprehension" conviction was infected merely with "trial error," namely an improper amendment. *Burks v. United States*, 437 U.S. 1, 14, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). An appeal predicated on trial error rather than evidentiary insufficiency does not implicate federal double jeopardy because jeopardy is treated as continuing throughout the appeal process and a defendant waives double jeopardy protection by the fact of his appeal. *Id.; Tibbs*, 457 U.S. at 39–40, 102 S.Ct. 2211. Therefore, while we must vacate the "reasonable apprehension" conviction because of the trial error, the state may refile the charge upon remand.

FIDEL, Judge, concurring.

¶ 69 It would be more appropriate in concluding ¶ 68, in my judgment, simply to remand for proceedings consistent with this opinion. Although it can sometimes be helpful to offer the trial court more concrete guidance on remand, I am not prepared to do so here because the parties have not had the opportunity to brief the issues that ¶ 68 raises or to contest the conclusions that it draws.

In all other respects, I join in the lead opinion.

HALL, Judge, dissenting.

¶ 70 Rather than analyze this case from the perspective of whether the amendment prejudiced the defendant, the majority effectively holds that a criminal defendant's entitlement to notice of the charged crime necessarily includes a right to pretrial notice of the precise theory upon which the state will rely at trial. This holding is contrary to well-established Arizona case law. *See, e.g., State v. West*, 176 Ariz. 432, 442–43, 862 P.2d 192, 202–03 (1993). Further, I disagree with the majority's apparent conclusion that anything other than a minor variance between the original charge and the proof at trial is prejudicial per se.[5]

¶ 71 In *Bruce*, 125 Ariz. at 423, 610 P.2d at 57, our supreme court broadly defined a formal or technical defect under Arizona Rule of Criminal Procedure 13.5(b) as one that "does not operate to change the nature of the offense charged or to prejudice the defendant in any way." Rule 13.5(b) additionally provides that "[t]he charging document shall be deemed amended to conform to the evidence adduced at any court proceeding." This provision applies automatically when the nature of the underlying crime is not changed. *State v. Eastlack*, 180 Ariz. 243, 258, 883 P.2d 999, 1014 (1994). Before count one was amended at the conclusion of the state's case-in-chief, defendant was charged with committing aggravated assault on Officer Bingaman on November 14, 1999, a class six felony, in violation of A.R.S. § 13–1204(A)(5) (1999). After the amendment, defendant was still charged with committing aggravated assault on Officer Bingaman on November 14, 1999, a class six felony, in violation of § 13–1204(A)(5). Because count one as amended did not charge a new or different offense, but merely constituted a change in the state's theory of the case, defendant was required to demonstrate *actual* prejudice caused by the amendment. *State v. Jones*, 188 Ariz. 534, 544, 937 P.2d

---

5. The majority claims this characterization is inaccurate. Yet, as examples of constitutionally permissible amendments, the majority cites cases permitting a one-digit change in the serial number of a stolen television set, a corporate name change in a securities fraud proceeding, and a one-day change in the date of an offense. *Supra* ¶ 19.

1182, 1192 (App.1996). I am unable to conclude that the trial court abused its considerable discretion in finding that defendant suffered no prejudice. *See State v. Sammons,* 156 Ariz. 51, 55, 749 P.2d 1372, 1376 (1988) (trial court's ruling on a motion to amend made pursuant to Rule 13.5(b) is reviewed for an abuse of discretion); *State v. Williams,* 108 Ariz. 382, 387, 499 P.2d 97, 102 (1972) ("Arizona courts have been liberal in allowing amendments, providing that the amendment does not lead to a charge of a different crime."). Therefore, I respectfully dissent.

## I. Nature of the Offense Charged

¶ 72 The majority's conclusion that defendant is not required to show any prejudice is premised on its mistaken belief that aggravated assault on a peace officer involving "knowing touching," A.R.S. § 13–1203(A)(3), is a different offense than aggravated assault on a peace officer involving "reasonable apprehension," § 13–1203(A)(2). Because my colleagues' premise is flawed, their analysis misses the mark.[6]

¶ 73 Pursuant to § 13–1204(A)(5), a person is guilty of aggravated assault "if the person commits assault as defined in § 13–1203 ... [while] knowing or having reason to know that the victim is a peace officer." As defined in the statute, an aggravated assault on a particular peace officer is a single offense, regardless of the manner in which the assault occurs. Count one of the information would have been sufficient had it simply accused defendant of assaulting Officer Bingaman in violation of § 13–1204(A)(5) and not specified the particular subsection of § 13–1203 under which the state was proceeding. *See* Ariz. R.Crim. P. 13.2. Thus, the issue on appeal should be whether defendant was actually prejudiced by the amendment to the information. *See Jones,* 188 Ariz. at 544, 937 P.2d at 1192 ("When the amendment results in no change in the underlying offense or actual

prejudice to the defendant, the indictment is automatically deemed amended to conform to the evidence adduced at trial.").

¶ 74 However, because a person may commit the misdemeanor offense of assault in any of three ways, § 12–1203(A)(1)–(3), the majority interprets § 13–1204(A)(5) as creating at least two, and presumably three, separate and distinct offenses. This interpretation is irreconcilable with the conclusion we reached in *Winter,* 146 Ariz. at 464–65, 706 P.2d at 1231–32, that the various subsections of A.R.S. § 13–1802 (1982) simply set forth alternative means of committing the unitary offense of theft. Instead, my colleagues break with settled precedent by asserting that pursuant to the Sixth Amendment "the state must tell a defendant in advance under which of the two [subsections] he is being prosecuted," notwithstanding any inconvenient "statutory nomenclature" to the contrary. *Supra* ¶ 44.

¶ 75 I disagree with the majority's argument, which hinges on its claim that an indictment charging a defendant with one count of aggravated assault pursuant to § 13–1204(A)(5) is defective as duplicitous, i.e., charging multiple offenses in one count, unless limited to only one of the three theories of assault enumerated in § 13–1203. Although separate offenses must be stated in separate counts, *see* Rule 13.3(a), "[a] count is not considered duplicitous merely because it charges alternate ways of violating the same statute." *State v. O'Brien,* 123 Ariz. 578, 583, 601 P.2d 341, 346 (App.1979). Generally, "where an offense may be committed by different means, an indictment or information may charge in one count all means that are not repugnant to each other." *State v. Parmenter,* 74 Wash.2d 343, 444 P.2d 680, 686 (1968). Thus, I am unable to join my colleagues in their willingness to dispense with the legislature's definition of aggravated assault as mere "statutory nomenclature." *See State v. Miranda,* 200 Ariz. 67, 69, ¶ 5, 22

**6.** The majority sets up a "strawman" argument by inaccurately attributing to the state "the position that if evidence of another offense is admitted during trial it may amend to charge that offense," *supra* ¶ 36, and then suggests that such an approach would permit the state to amend an indictment mid-trial to charge a defendant with

uncharged crimes. I agree with the majority's comment that such an interpretation of Rule 13.5(b) would indeed be "implausible." *Supra* ¶ 37. But the state simply argues, notwithstanding the majority's contrary characterization, that the amendment in this case neither changed the nature of the offense nor prejudiced defendant.

P.3d 506, 508 (2001) ("Defining crimes and fixing punishments are functions of the legislature.").[7]

¶ 76 The majority's construction of § 13–1204(A)(5) is inconsistent with a long line of Arizona cases that have interpreted analogous statutes as simply enumerating alternative means of satisfying one element of a single offense. *See, e.g., State v. Encinas,* 132 Ariz. 493, 496, 647 P.2d 624, 627 (1982) ("[F]irst degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder."); *State v. Klem,* 108 Ariz. 349, 350, 498 P.2d 216, 217 (1972) (The various subsections of A.R.S. § 13–611 "merely state[ ] the different circumstances under which sexual intercourse constitutes the crime of rape."); *State v. Martin,* 105 Ariz. 265, 266, 463 P.2d 63, 64 (1970) (Statute prohibiting sale, furnishing, administering, or giving away marijuana merely states different ways in which the same crime could be committed.); *Winter,* 146 Ariz. at 464, 706 P.2d at 1231 ("[T]heft in A.R.S. § 13–1802 is [ ] a single offense even though it has multiple subsections."); *State v. Bruni,* 129 Ariz. 312, 317, 630 P.2d 1044, 1049 (App.1981) (Kidnapping is one crime that may be committed in different ways.).

¶ 77 Similarly, in *Schad v. Arizona,* 501 U.S. 624, 645, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), in which the defendant claimed that the United States Constitution required juror unanimity in capital cases, *id.* at 630, 111 S.Ct. 2491, the United States Supreme Court rejected Schad's argument that premeditated murder and felony murder in Arizona are separate crimes for which the jury must return separate verdicts. In its plurality opinion upholding the constitutionality of allowing a jury to return a general verdict, the Court noted that "legislatures frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes." *Id.* at 636, 111 S.Ct. 2491. Further, "it has long been the general rule that when a single crime can

be committed in various ways, jurors need not agree upon the mode of commission." *Id.* at 649, 111 S.Ct. 2491 (Scalia, J., concurring).

¶ 78 Clearly, Arizona's legislature has defined one crime of aggravated assault on a peace officer pursuant to § 13–1204(A)(5). The fact that one of the elements of this offense may be satisfied by alternative means does not create three separate and distinct offenses. In holding to the contrary, the majority has effectively rewritten § 13–1204(A)(5).

¶ 79 The implications of the majority opinion extend far beyond the aggravated assault statute. Presumably, for example, the majority would find duplicitous an indictment charging a felony murder count that alleged more than one predicate offense. Indeed, not only would the logic of the majority's "separate offense" analysis impose a limit of one predicate offense per felony murder count, it would require that any additional theory of liability for each predicate felony be set forth in a separate count and that the jury be required to return a unanimous verdict as to each count.

## II. Reversible Per Se Rule

¶ 80 Because the amendment did not change the nature of the offense, the proper inquiry is whether the defendant was prejudiced by the amendment. *Jones,* 188 Ariz. at 544, 937 P.2d at 1192. However, instead of deciding whether the trial court abused its discretion under Rule 13.5(b) in finding that the amendment did not prejudice defendant, the majority formulates and applies a stringent reversible per se rule, under which any but the most minor variance between the charge and the proof at trial would be found to violate a defendant's Sixth Amendment right "to be informed of the nature and cause of the accusation." In addition to being contrary to Arizona case law, the majority's approach is an unwise step in the direction of

---

**7.** The majority seemingly (and incorrectly) attributes to me the belief that a charge of simple assault pursuant to one subsection of § 13–1203 constitutes adequate notice to the defendant that he may also be convicted under the two remaining subsections. *Supra* ¶¶ 45, 46. Defendant is

not charged with misdemeanor assault. Rather, as framed by the majority, the issue is whether an information charging a person with aggravated assault on a peace officer pursuant to A.R.S. § 13–1204(A)(5) is necessarily deficient if it does not specify the underlying theory of the assault.

returning Arizona to a bygone era in which technical precision was a trap for the unwary. *See, e.g., Territory v. Marinez,* 5 Ariz. 55, 55–56, 44 P. 1089, 1089 (1896) (finding a fatal variance between indictment charging larceny of a steer and evidence showing that the animal was a spayed cow).

¶ 81 More importantly, the majority's reliance on federal case law for its assertion that the amendment to the charge violated defendant's Sixth Amendment rights is misplaced. The automatic reversal rule in federal courts is generally limited to cases involving a substantial variance between the indictment and the proof that results in an implicit alteration in the charging document referred to as a "constructive" amendment. A "trial court constructively amends the indictment if it allows the Government to prove its case in a fashion that creates a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Apodaca,* 843 F.2d 421, 428 (10th Cir.1988) (internal quotations omitted). For example, in *Stirone v. United States,* 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the defendant was indicted for obstructing an interstate shipment of sand, but the trial court's instructions to the jury permitted a guilty verdict based on a finding that the defendant had interfered with a shipment of steel. The Supreme Court reversed the defendant's conviction because the possibility that he had been convicted of a charge never made "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Id.*

¶ 82 Although constructive amendments are reversible per se, mere variances between the indictment and proof are evaluated under a harmless error standard. *United States v. Young,* 730 F.2d 221, 223 (5th Cir. 1984). In such cases, the proper inquiry "is not whether there has been a variance in proof, but whether there has been a variance as to 'affect the substantial' rights of the accused." *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)

(quoting 28 U.S.C. § 391); *see also State v. Neese,* 126 Ariz. 499, 504, 616 P.2d 959, 964 (App.1980) ("We have held that in order to constitute grounds for reversal, a variance between proof and indictment must affect the substantial rights of the defendant by preventing him from presenting his defense properly, taking him unfairly by surprise, or exposing him to double jeopardy.") (quoting *United States v. Lyman,* 592 F.2d 496, 500–01 (9th Cir.1978)).

¶ 83 The federal cases relied on by the majority do not support its conclusion that defendant's conviction is reversible per se. For example, in *Gray,* 662 F.2d at 572, 575, only one judge on the three-judge panel actually found a per se Sixth Amendment violation, and one judge dissented because he found no due process violation. (Duniway, J., concurring and dissenting). The deciding vote was cast by Judge Tang, who found no per se Sixth Amendment violation, but voted to reverse because he believed the defendant's due process rights were violated because he was "taken by surprise" by the state's request for a second degree statutory rape instruction after defendant had already testified to having consensual sexual intercourse with the victim. *Id.* at 574–75 (Tang, J., specially concurring). Thus, *Gray* is a "prejudice," not a "prejudicial per se" case.

¶ 84 In *Sheppard,* 909 F.2d at 1236, the state conceded on appeal that the defendant's Sixth Amendment rights to advance notice and an opportunity to prepare were violated when the state prosecuted the defendant on a theory of premeditated first degree murder and only advanced its theory of felony murder after the instructions had been settled and the case was ready for argument. Therefore, the issue before the Ninth Circuit was whether to apply the harmless-error doctrine, not whether a per se Sixth Amendment violation existed. *Id.* at 1237. The court declined to engage in a harmless-error analysis only because the defendant did not have the opportunity to present his own evidence in defense of felony murder.[8] *Id.*

---

8. *Sheppard* was cited by our supreme court in *State v. Blakley,* 204 Ariz. 429, ¶¶ 57–58, 65 P.3d 77 (2003), which reversed defendant's felony

murder conviction because he was actually *prejudiced* by an instruction based on an undisclosed predicate felony.

¶ 85 In *Hunter*, 916 F.2d at 597–98, the defendant was charged with first degree criminal sexual penetration by engaging in sexual intercourse with a minor female under the age of thirteen "between January 1, 1974, and October 23, 1977," an offense for which life imprisonment was a potential punishment. After evidence that defendant penetrated the victim with his finger was presented at trial, the court "constructively" amended the information by instructing the jury that the state could also prove first degree criminal sexual penetration with evidence that defendant inserted his finger in the victim's vagina during that same time frame, even though digital penetration was only a fourth degree felony until June 1975. *Id.* at 597. Thus, under the court's instructions to the jury, the jury might have convicted defendant of first degree sexual penetration based on digital penetration occurring before June 1975. *Id.* at 598. If so, Hunter was only guilty of fourth degree sexual assault, an offense for which he was not charged and for which the maximum punishment was one to five years of imprisonment. *Id.* at 597–98. Under these circumstances, the court held that the amendment effectively altered the substance of the information and was reversible per se as a constructive amendment. *Id.* at 599.

¶ 86 The majority's reliance on *Joseph*, 765 F.2d 394, is similarly misplaced because that court reversed defendant's conviction based on a prejudice, and not a prejudicial per se, analysis. Joseph was charged with rape. His theory of defense was consent. *Id.* at 397. During trial, the victim testified she was fifteen-years-old when the assault occurred. *Id.* at 396 n. 3. At the close of all the evidence, the trial court instructed the jury on the additional offense of statutory rape to which lack of consent was not a defense. The jury convicted the defendant of the statutory rape offense. *Id.* at 396. Because the defendant did not object to the jury charge, the Third Circuit, employing a fundamental error analysis, held that the variance between the information and the verdict violated the defendant's right to be notified of the charge against him because:

By permitting the jury to convict Joseph of [statutory rape]—a strict liability offense— the court rendered appellant's theory of defense—consent—totally ineffective. Moreover, because age was not identified as an issue in the case prior to the jury charge, the only evidence of [the victim's] age was her seemingly unimportant testimony that she was fifteen at the time the alleged rape took place. Although unlikely, it is certainly possible that [the victim] erred as to her age at the relevant time and that Joseph could have disputed her testimony had he been aware of its importance and given time to prepare an appropriate defense.

*Id.* at 397–98 (footnotes omitted).

¶ 87 In contrast, here the information against defendant was not "constructively" amended after the close of all the evidence. Thus, there was no "variance" between the information and proof as that concept is commonly understood. More importantly, because the amendment did not result in a change in the nature of the offense, *see State v. Van Vliet*, 108 Ariz. 162, 164, 494 P.2d 34, 36 (1972) (amendment to information substituting name of actual victim of armed robbery did not change nature of offense), the prejudicial per se rule is inapplicable.

### III. Prejudice

¶ 88 Defendant also claims that he was prejudiced by the amendment because (1) an acquittal on the amended charge would not have barred a subsequent prosecution on the original count one and (2) the change in the state's theory surprised him.

#### A. Double Jeopardy

¶ 89 A defendant is prejudiced when an acquittal of the amended charge would not bar prosecution on the original charge. *See Bruce*, 125 Ariz. at 423–24, 610 P.2d at 57–58. The double jeopardy clauses of both the federal and Arizona constitutions prohibit a person from being put in jeopardy twice for the "same offense." U.S. Const. amend. V; Ariz. Const. art. 2, § 10. In determining whether multiple prosecutions violate the federal double jeopardy clause, the United States Supreme Court applies the "same-

elements" test. *Dixon*, 509 U.S. at 696, 113 S.Ct. 2849. Under this test, if each offense contains an element the other does not, then the two violations do not constitute the same offense, and a subsequent prosecution is not barred. *See State v. Eagle*, 196 Ariz. 27, 31–32, ¶ 21, 992 P.2d 1122, 1126–27 (App.1998) ("[I]f each criminal statute requires 'proof of a fact which the other does not,' the statutes do not govern the same offense.") (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).

¶ 90 The Achilles' heel of the majority's approach is exposed by its corollary assertion that the double jeopardy clause does not bar the state from retrying a defendant multiple times for the crime of aggravated assault on a peace officer. Notwithstanding its contrary claim, this implausible conclusion is compelled not by *Dixon*'s same-elements test but by the majority's insistence that a single episode of assaultive conduct on a peace officer may result in three "distinctly different crimes" under § 13–1204(A)(5). However, if I am correct that § 13–1203(A)(1)–(3) merely provides the state alternative means to prove the same element of "assault" in a prosecution for aggravated assault pursuant to § 13–1204(A)(5), a defendant who is acquitted of the charge of aggravated assault on a peace officer may not be retried on that "same offense." Thus, in addition to being consistent with cases interpreting analogous statutory frameworks, *supra* ¶ 76, the "alternative means" interpretation of § 13–1204(A)(5) possesses the advantage of protecting a defendant from a subsequent prosecution for the same offense. *See Williams*, 108 Ariz. at 387, 499 P.2d at 102 ("[W]hen there was only one robbery of the service station in question, it would seem clear that the acquittal on the amended information would bar prosecution on the original information."). Based on my analysis, defendant could have pled an acquittal on the amended charge as a defense to the original charge. Therefore, he was not prejudiced by the amendment.

## B. Surprise

¶ 91 Alternatively, defendant claims he was unprepared to defend against the amended count. The majority's contrary characterization notwithstanding, the trial court's finding that defendant should not have been "surprised" by the prosecutor's motion to amend finds ample support in the record. From the outset, the evidence clearly reflected that any "knowing touching" of the officer by defendant occurred within the broader context of the officer's "apprehension" of physical injury.

¶ 92 At the preliminary hearing, Officer Bingaman, whom the defendant outweighed by approximately eighty-five pounds, testified that: (1) defendant was already out of his vehicle when the officer pulled into the parking lot to make the stop and "was walking quickly towards me, and he was obviously upset;" (2) he asked dispatch to send another unit because defendant was "yelling" at him and was "upset;" (3) defendant refused several requests by the officer to produce his driver's license, remained "argumentative" and tried to leave when informed by the officer that he would be arrested if he failed to provide identification; (4) defendant spun around, struck the officer's arm away, and clenched his fists; (5) the officer grabbed both of defendant's arms to avoid being struck again; (6) defendant struggled with the officer all the way back to the patrol car as the officer was attempting to get him under control; and (7) defendant's "belligerent and cursing" behavior "from the initial contact . . . led me to believe that I was in a potential situation of being injured." Further, as noted by the trial court, defendant also received additional notice of the facts that formed the basis of the charge from the departmental reports of the incident, and statements made by Officer Bingaman at both defendant's traffic hearing and during an internal investigation conducted by the police department after defendant filed a complaint alleging excessive force by Officer Bingaman. *See Sheppard*, 909 F.2d at 1236 n. 2 (in determining whether a defendant has adequate notice of the nature and cause of an accusation, "[t]he Constitution itself speaks not of form, but of substance.").

¶ 93 At trial, the prosecutor gave a mini-opening statement, during which she told

prospective jurors that defendant "struggled with the officer to a point where the officer was physically injured" and "was in fear he was going to be injured more," and that he released the dog because "he was in fear for his own life. . . ." In his trial testimony, Officer Bingaman reiterated his preliminary hearing testimony in greater detail, and was extensively cross-examined by defendant, including questions regarding any verbal threats made by defendant and what there was about the situation and defendant's actions that caused the officer to be "concerned" for his safety.

¶ 94 Given this background, I believe that the trial court acted within its discretion in determining that defendant was not ambushed by the state's motion to amend at the conclusion of its case-in-chief. The only specific claim of prejudice made by trial counsel was that the state's change in theory deprived defendant from relying on self-defense, the "whole theory of the defense." However, as later determined by the trial court during settlement of jury instructions, justification was not a viable defense for the aggravated assault charge in any event because "the assault on the officer, if any, had already been completed prior to the time that any justification might have arisen because of the alleged use of excessive force[,]" i.e., the dog. Defendant's claim of surprise is further belied because after the court granted the state's motion to amend, defendant neither asked for a continuance nor recalled Officer Bingaman for additional cross-examination.[9]

## IV. Conclusion

¶ 95 The state's change in theory for the assault did not constitute a change in the nature of the offense because aggravated assault on a peace officer is one offense pursuant to § 13–1204(A)(5) for which a defendant may only be placed in jeopardy one time, regardless of the manner in which it is committed. Further, the defendant was not prejudiced. Therefore, I would affirm.

---

**9.** The majority takes me to task for unfairly criticizing defense counsel in her handling of the case. To the contrary, I believe defense counsel did the best she could given the facts of the case. However, it is defendant who is claiming that the trial court abused its discretion and it is defendant who bears the burden of showing that he suffered *actual* prejudice from the amendment. *Jones*, 188 Ariz. at 544, 937 P.2d at 1192. Defendant made no offer of proof in the trial court nor has he urged on appeal how he would have tried the case differently if given earlier notice of the (A)(2) theory. That defense counsel made no effort to recall witnesses and that she did not request a continuance is not evidence of counsel's inadequacy. Rather, I think it fair to conclude from this record that counsel believed the justification defense—albeit later rejected by the trial court—was unaffected by the amendment.